380 A.2d 362

**COMMONWEALTH of Pennsylvania**

v.

**Paulette WHITFIELD, Appellant (two cases).**

Supreme Court of Pennsylvania.

Argued Jan. 21, 1977.

Decided Dec. 1, 1977.

Gilbert E. Toll, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Gaele Barthold, Philadelphia, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY and MANDERINO, JJ.

## OPINION

EAGEN, Chief Justice.

Paulette Whitfield was convicted in a nonjury trial in Philadelphia of murder of the third degree and possessing an instrument of crime generally.

Initially a prison sentence of 9 months to 5 years was imposed on the murder conviction. However, upon reconsideration this was changed by the court to 5 years probation. A concurrent period of 5 years probation was also imposed on the remaining conviction. These appeals are from these orders.[1]

Whitfield contends that the Commonwealth failed to sustain its burden of proving her sanity beyond a reasonable doubt, and even if it did meet this burden, the trial evidence was only sufficient to support a verdict of voluntary manslaughter rather than murder of the third degree. The Commonwealth's trial evidence established the following.

On October 29, 1974, at approximately 5:00 p. m. Whitfield went to her mother's house which was located across the street from her own residence. An argument ensued between Whitfield and Staunton "Stoney" Parker, the mother's common law husband, and to alleviate the situation Whitfield's mother pushed Parker out of the house.

Parker, a drug addict, then left for an appointment at a methadone clinic. Whitfield proceeded to her own house and came back outside carrying a knife. Her mother and others took the knife from her. Parker returned about an hour later. Having obtained a second knife, Whitfield walked from her own house over to where Parker was parking his car, a distance of 20 feet, and stabbed him once in the upper thorax. The wound was fatal.

The defense first offered the testimony of eight character witnesses. Whitfield's brother, Michael, then testified to events before and after the killing. Another brother, Clarence, testified to his observations of the stabbing incident and also to Staunton Parker's previous sexual molestations of Whitfield. Upon taking the stand, Whitfield testified mainly to the indignities and sexual abuses suffered at the hands of the decedent when she was 11 to 14 years old, and

1. The appeal from the order of probation imposed on the possession of an instrument of a crime conviction was filed in the Superior Court and certified here.

to a sealed letter she had written to her mother concerning these matters. In its opinion, the trial court noted:

"It would appear that the defendant may very well have suffered some traumatic experiences, but by her own testimony, the latest of such incidents occurred approximately 7 years prior to the homicide."

Dr. Perry A. Berman, a psychiatrist, testified for the defense and expressed the opinion that Whitfield suffered a temporary psychosis and at the time of the stabbing was unable to distinguish right from wrong. In rebuttal, the Commonwealth called Dr. Robert L. Sadoff, a psychiatrist, who expressed the opinion that at the time of the incident Whitfield was relatively normal; that she knew it was wrong to stab another person; and, that she was aware of the nature and quality of the act of using a knife on another person. Dr. Sadoff concluded that Whitfield was not temporarily insane, at least at the instant when the knife went into Staunton Parker's body.

Whitfield argues that the testimony of the Commonwealth's psychiatrist, Dr. Sadoff, was not sufficient to establish her sanity beyond a reasonable doubt particularly when considered with the testimony of Dr. Berman. Although Dr. Sadoff admitted the possibility that, under circumstances similar to the facts of this case, a person could suffer a temporary insanity or psychosis, he stated clearly that this did not happen to Whitfield and contrary to what she asserts, he gave a convincing explanation for his conclusion.

In a related argument Whitfield asserts the trial court failed to consider the testimony of Dr. Berman in adjudicating Whitfield's competency at the time of the homicide. This is inaccurate as demonstrated by the following included in the court's opinion filed in support of his adjudication:

"[Dr. Berman,] in effect, stated that it was his opinion that for a few moments before, during and after the stabbing, the defendant was temporarily psychotic; that in legal terms, she was temporarily insane, being unable to determine right from wrong.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"In considering all of the testimony, including the opinions of both psychiatrists, this court has concluded that the defendant failed this [M'Naghten] test and that she was legally sane when she fatally wounded the decedent."

In any event, our standard of review is a limited one. Psychiatric testimony, like any other evidence, is for the trier of fact to consider and to determine what weight it should be given. *Commonwealth v. Davis,* 462 Pa. 27, 31, 336 A.2d 888, 890, *cert. den. sub nom. Davis v. Pennsylvania,* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975); *Commonwealth v. McCusker,* 448 Pa. 382, 292 A.2d 286 (1972). From an independent examination of the whole record, we hold that in the instant case the judge, sitting as trier of fact, had adequate evidence from which to conclude that the Commonwealth had borne its burden of proving Whitfield's sanity beyond a reasonable doubt.

Directing our attention now to the issue of whether the evidence presented by the Commonwealth was sufficient to support a verdict of murder of the third degree rather than voluntary manslaughter, we will briefly review the distinction between these two crimes. Portions of the relevant Pennsylvania statutes involved are set out below.[2]

2. "§ 2501. Criminal homicide
"(a) Offense defined.—A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being.
"(b) Classification.—Criminal homicide shall be classified as murder, voluntary manslaughter, or involuntary manslaughter."
"§ 2502. Murder
"(a) Murder of the first degree.—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.
"(b) Murder of the second degree.—A criminal homicide constitutes murder of the second degree when the death of the victim occurred while defendant was engaged as a principal or an accomplice in the perpetration of a felony.
"(c) Murder of the third degree.—All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.
"(d) Definitions.—As used in this section the following words and phrases shall have the meanings given to them in this subsection:
*    *    *    *    *    *    *    *    *    *    *

In *Commonwealth v. Coleman,* 455 Pa. 508, 510, 318 A.2d 716, 717 (1974), we said:

"To sustain a conviction of murder of either degree, the evidence must establish that the killing was committed with malice. Legal malice may be inferred and found from the attending circumstances of the act resulting in the death. It consists of either an express intent to kill or inflict great bodily harm, or of a 'wickedness of disposition, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty' which indicates an unjustified disregard for the likelihood of death or great bodily harm and an extreme indifference to the value of human life." [Citations omitted.]

Also,

"[m]alice is properly implied when a deadly weapon is directed to a vital part of the body."

*Commonwealth v. Palmer,* 448 Pa. 282, 288, 292 A.2d 921 (1972).

█ In the traditional common law terminology of the criminal law, the gravamen of both murder of the first degree and voluntary manslaughter is the intentional, inexcusable, and unjustified killing of a human being. The hallmark of the crime of voluntary manslaughter, as distinguished from murder, however, is the lack of malice in the legal sense of that term. *Commonwealth v. Robson,* 461 Pa.

'Intentional killing.' Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing."

"§ 2503. Voluntary manslaughter

"(a) General rule.—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

"(b) Unreasonable belief killing justifiable.—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title, but his belief is unreasonable."

18 Pa.C.S.A. §§ 2501, 2502, 2503 (Supp. 1977–78).

615, 625, 337 A.2d 573, 578 [citing cases], *cert. den. sub nom. Robson v. Pennsylvania,* 423 U.S. 934, 96 S.Ct. 290, 46 L.Ed.2d 265 (1975). An examination of our present voluntary manslaughter statute, reveals that Section 2503(a) is in basic conformity with the traditional common law notions of voluntary manslaughter, and Section 2503(b) will effectively reduce the crime of murder to voluntary manslaughter when a person who intentionally or knowingly kills another *unreasonably* believes at the time of the killing the circumstances to be such that, if they existed, would justify the killing under the General Principles of Justification section of the Crimes Code, 18 Pa.C.S.A. §§ 501–510 (1973). Compare *Commonwealth v. Pride,* 450 Pa. 557, 301 A.2d 582 (1973); *Commonwealth v. Miller,* 313 Pa. 567, 170 A. 128 (1934). Although the basic notions contained in Section 2503(b) have been described as a "modern tendency, not yet far advanced," see LaFave and Scott, *Handbook on Criminal Law,* § 77 at 583 (1972), it is clear that Section 2503(b) is consistent with Pennsylvania law prior to the Crimes Code.

With regard to Whitfield's contention that she is guilty of voluntary manslaughter at most, we note that in *Commonwealth v. McCusker,* 448 Pa. 382, 292 A.2d 286 (1972), this Court reversed a trial court's refusal to admit psychiatric testimony for the limited purpose of determining whether or not the defendant acted in the heat of passion when he committed the act. As Whitfield correctly notes, *McCusker* allows the trier of fact to place reliance upon the cumulative impact of a series of related events in making the objective determination as to what constitutes legally adequate provocation: "The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was 'incapable of cool reflection.'" *Commonwealth v. McCusker, Id.* 448 Pa. at 389–90, 292 A.2d at 286, 290 [footnote omitted]. *If and when* sufficient provocation is found, then the focus of inquiry for the trier of fact shifts to the defendant's response to that provocation:

"The relevant inquiry is threefold: did the defendant actually act in the heat of passion when he committed the homicide; did the provocation directly lead to the slaying of the person responsible for the provocation; and was there insufficient 'cooling time' thus preventing a reasonable man from using his 'reasoning faculties' and 'capacity to reflect.' Absent any of these elements an accused's defense of provocation must fail and he is not entitled to a verdict of voluntary manslaughter." *Id.* 448 Pa. at 390, 292 A.2d at 290.

■ Under the applicable standard of review, *Commonwealth v. Bastone*, 466 Pa. 548, 353 A.2d 827 (1976), we find that there was ample evidence to sustain a conviction of murder of the third degree.

First, adequate legal provocation was absent. The dispute was over a trivial matter of blackeyed peas and leaving a door open. See *Commonwealth v. Lassiter*, 457 Pa. 582, 321 A.2d 902 (1974). (Argument over three dollar bet—insufficient provocation to reduce crime to voluntary manslaughter.) Even assuming the presence of adequate legal provocation, it must be noted that the dispute between Whitfield and Staunton Parker took place either "about an hour" before the killing according to Whitfield's mother, or "about half an hour" before the killing according to Whitfield's own statement in the police interview sheet which is part of the trial record. Furthermore, contrary to Whitfield's occasional allusions in her brief to the victim having threatened her immediately before the stabbing, the evidence is all to the contrary. As the trial judge noted in his opinion: "The decedent was killed just as he was getting out of his automobile; he had done nothing at that time to provoke the defendant. There was no evidence, at the time of attack, of the anger, rage, sudden resentment or terror rendering the mind incapable of cool reflection necessary for a voluntary manslaughter."

■ In conclusion, we repeat the trier of fact has the right to reject part or all of the defendant's testimony even if uncontradicted. *Commonwealth v. Coleman*, 455 Pa. 508,

510, 318 A.2d 716, 717 (1974), citing *Commonwealth v. Chermansky,* 430 Pa. 170, 174, 242 A.2d 237, 240 (1968). Indeed, the court, sitting as the trier of the facts, "may believe all, a part or none of the testimony of any witness for the Commonwealth or defense." *Commonwealth v. Hornberger,* 441 Pa. 57, 61, 270 A.2d 195, 197 (1970) [citations omitted], and "[a] jury is still free to decide for itself the weight it wishes to give to such testimony in its determination of whether a defendant is entitled to a verdict of voluntary manslaughter." *Commonwealth v. Demmitt,* 456 Pa. 475, 482, 321 A.2d 627, 631 (1974), referring to *Commonwealth v. McCusker,* 448 Pa. 382, 292 A.2d 286 (1972). See also *Commonwealth v. Davis,* 462 Pa. 27, 31, 336 A.2d 888, 890, *cert. den. sub nom. Davis v. Pennsylvania,* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975).

Orders affirmed.

JONES, former C. J., and NIX, J., did not participate in the consideration or decision of this case.

MANDERINO, J., concurs in the result.